# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CITY OF DETROIT POLICE AND FIRE RETIREMENT SYSTEM, Derivatively On Behalf of NiSource, Inc. | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2021-0370-KSJM |
| JOSEPH HAMROCK, ARISTIDES S. CANDRIS, CAROLYN Y. WOO, DEBORAH A. HENRETTA, ERIC L. BUTLER, KEVIN T. KABAT, MICHAEL E. JESANIS, PETER A. ALTABEF, THEODORE H. BUNTING, JR., WAYNE S. DEVEYDT, RICHARD L. THOMPSON, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| NISOURCE, INC., | ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Submitted: February 3, 2022
Dated: June 30, 2022

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Daniel S. Sommers, Joshua Handelsman, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C.; Richard A. Speirs, Amy Miller, COHEN MILSTEIN SELLERS & TOLL PLLC, New York, New York; Rusty E. Glenn, SHUMAN, GLENN & STECKER, Denver, Colorado; Brett D. Stecker, SHUMAN, GLENN & STECKER, Ardmore, Pennsylvania; Ronald A. King, CLARK HILL PLC; *Counsel for Plaintiff City of Detroit Police and Fire Retirement System*.

Gregory P. Williams, Raymond J. DiCamillo, Katharine L. Mowery, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Walter C. Carlson, Nilofer Umar, Neil H. Conrad, Caroline A. Wong, SIDLEY AUSTIN LLP, Chicago, Illinois; *Counsel for Individual Defendants Joseph Hamrock, Aristides S. Candris, Carolyn Y. Woo, Deborah A. Henretta, Eric L. Butler, Kevin T. Kabat, Michael E. Jesanis, Peter A. Altabef, Theodore H. Bunting, Jr., Wayne S. DeVeydt, Richard L. Thompson and Nominal Defendant NiSource Inc.*

**McCORMICK, C.**

Nominal Defendant NiSource, Inc. is an energy holding company with natural gas and electricity businesses. Its natural gas subsidiaries operate more than 50,000 miles of pipeline, serving millions of customers in several states. Tragedy struck when NiSource's former gas distribution subsidiary in Massachusetts, Bay State Gas Company d/b/a Columbia Gas of Massachusetts ("CMA"), attempted to replace an old cast-iron pipe with a modernized polyethylene pipe in Lawrence, Massachusetts. A CMA construction crew disconnected the old pipe without first relocating regulator-sensing lines to the new pipe. The regulator perceived a drop in pressure, triggering the flow of high-pressure gas into the low-pressure distribution system. The system became over-pressurized, resulting in fires and explosions that caused one fatality, injuries to 22 people, and damage to 131 structures (the "Greater Lawrence Explosions").

Wielding documents obtained under Section 220 of the Delaware General Corporation Law, the stockholder plaintiff filed suit derivatively on behalf of NiSource to hold certain current and former NiSource directors liable for the corporate trauma resulting from the Greater Lawrence Explosions. The defendants have moved to dismiss the complaint for failure to plead demand futility.

The plaintiff argues the defendants cannot impartially consider a demand because they face a substantial likelihood of liability under *In re Caremark International Inc. Derivative Litigation*.[1] The plaintiff advances three theories.

---

[1] 698 A.2d 959 (Del. Ch. 1996).

The plaintiff first argues that the defendants face a substantial likelihood of liability under *Caremark* for utterly failing to implement any reporting or monitoring system to oversee pipeline safety, which was "mission critical" for NiSource's gas businesses. The plaintiff's own allegations, however, demonstrate that the NiSource board of directors did establish a system for monitoring and reporting on pipeline safety issues. That system included a committee tasked with overseeing safety issues, which did, in fact, monitor and report on pipeline safety compliance.

The plaintiff next argues that this case is analogous to *In re Massey Energy Co.*,[2] where the court observed that a board breached its oversight obligations under *Caremark* by violating positive law in pursuit of profit. The plaintiff does not allege, however, that NiSource engaged in the degree of lawlessness at issue in *Massey*. The complaint identifies several NiSource board committees that monitored compliance and took concrete steps to align NiSource's operations with regulations and industry standards. Despite repeated regulatory violations, it is not reasonably conceivable that NiSource was "in the business" of unlawful conduct.

The plaintiff last argues that the NiSource board ignored "red flags" regarding NiSource's repeated violations of pipeline safety laws. This theory has more heft, but it too fails to establish a substantial likelihood of liability. The "red flags" are simply too general or disconnected from the root causes of the Greater Lawrence Explosions to place a reasonable observer on notice of the corporate trauma that ensued.

---

[2] 2011 WL 2176479 (Del. Ch. May 31, 2011).

Because of this, the plaintiff fails to adequately allege that the defendants faced a substantial likelihood of liability under *Caremark*. Demand is not excused, and this decision grants the defendants' motion to dismiss.

## I. FACTUAL BACKGROUND

The facts are drawn from the Verified Amended Shareholder Derivative Complaint (the "Amended Complaint") and documents it incorporates by reference, including documents produced to the plaintiff pursuant to 8 *Del. C.* § 220.[3] In particular, these facts draw heavily from the September 24, 2019 Pipeline Accident Report of the National Transportation Safety Board ("NTSB"), which was attached to the Amended Complaint.[4]

### A. NiSource, Its Board, And Its Board-Level Monitoring System

NiSource is a Delaware corporation with its principal place of business in Merrillville, Indiana. NiSource's gas subsidiaries operate approximately 53,700 miles of pipeline and deliver natural gas to 3.2 million customers across Indiana, Kentucky, Maryland, Ohio, Pennsylvania, and Virginia. NiSource also used to operate in Massachusetts through its subsidiary, CMA.

The business and affairs of NiSource are managed by a twelve-person board of directors (the "Board"). Eleven of the twelve directors are non-employee directors with no

---

[3] C.A. No. 2021-0370-KSJM, Docket ("Dkt.") 24 ("Am. Compl."). The plaintiff agreed that documents produced by NiSource as part of the plaintiff's pre-suit investigation under 8 *Del. C.* § 220 would be incorporated by reference into the Amended Complaint. Dkt. 33, Ex. 54 ¶ 7.

[4] Dkt. 24, Ex. D ("NTSB Rep.") at 28.

connection to NiSource apart from their Board service.[5] The twelfth director is NiSource's President and CEO, Joseph Hamrock.[6]

The Board has several committees tasked with monitoring and assessing "the Company's strategic, compliance, operational and financial risks,"[7] including the Audit Committee, the Risk Management Committee, and the Environmental, Safety and Sustainability ("ES&S") Committee. In addition, each Board committee is charged with overseeing risks associated with their respective areas of responsibility.

Safety risks were mainly within the purview of the ES&S Committee. The Board charged the ES&S Committee with "overseeing the programs, performance and risks relative to environmental, safety and sustainability matters."[8] The ES&S Committee's authority and responsibilities included, among other things, reviewing "the Company's programs, policies, practices and performance with respect to employee, contractor and public safety," reviewing "major legislation, regulation and other external influences pertaining to responsibilities of the Committee, and assess the impact on the Company," and reviewing "the Company's programs, policies, practices and performance with respect to environmental, health and safety compliance auditing."[9]

---

[5] The eleven outside directors are Defendants Peter Altabef, Theodore Bunting, Jr., Eric Butler, Aristedes Candris, Wayne DeVeydt, Deborah Henretta, Michael Jesanis, Kevin Kabat, Carolyn Woo, and non-parties Lloyd Yates and Deborah Hersman.

[6] The Amended Complaint also names Richard Thompson as a Defendant. Thompson served as the Board's Chairman from May 2013 until his retirement in May 2019.

[7] NiSource, Inc., Definitive Proxy Statement (Schedule 14A) 17 (Apr. 6, 2018).

[8] Am. Compl. ¶ 184.

[9] *Id.* ¶ 183.

The ES&S Committee was a functioning committee. The ES&S Committee held five formal meetings in each of 2016, 2017, and 2018.[10] Multiple senior executives attended and reported at each meeting.[11] The ES&S Committee regularly provided a report

[10] *Id.* ¶ 185; *see also* Dkt. 30, Ex. 7 (ES&S Committee minutes for January 28, 2016); Dkt. 31, Ex. 8 (ES&S Committee minutes for March 21, 2016), Ex. 9 (ES&S Committee minutes for May 10, 2016), Ex. 11 (ES&S Committee minutes for August 8, 2016), Ex. 12 (ES&S Committee minutes for October 24, 2016), Ex. 15 (ES&S Committee minutes for January 26, 2017); Dkt. 32, Ex. 16 (ES&S Committee minutes for March 20, 2017), Ex. 17 (ES&S Committee minutes for May 8, 2017), Ex. 19 (ES&S Committee minutes for August 7, 2017), Ex. 20 (ES&S Committee minutes for October 23, 2017).

[11] During the relevant period, Altabef, Butler, Candris, Henretta, Jesanis, and Woo served on the ES&S Committee. Am. Compl. ¶ 183. Hamrock, NiSource's President and CEO, Thompson, Board Chairman, and Kabat, Board Director, all "attended ES&S Committee meetings during the Relevant Period as if they were ES&S Committee members and thus have the same level of knowledge as the formal ES&S Committee members." *Id.* The ES&S Committee regularly received reports from a rotating cast of senior executives at NiSource and its subsidiaries. *See* Dkt. 30, Ex. 7 at NISOURCE000099–100 (noting presentations from Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training"); Dkt. 31, Ex. 8 at NISOURCE000125–127 (noting presentations from COO, Chief Regulatory Officer, Senior Vice Presidents for "Gas Operations," "Corporate Affairs," and "Safety, Environmental and Training," and Director of Capital Planning), Ex. 9 at NISOURCE000217–18 (noting presentations from Senior Vice President for "Safety, Environmental and Training" and Vice President for "Pipeline Safety"), Ex. 11 at NISOURCE000282–84 (noting presentations from a NIPSCO Senior Vice President, NiSource's Corporate Secretary, and Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training"), Ex. 12 at NISOURCE000380–82 (noting presentations from Senior Vice Presidents for "Gas Operations," "Capital Execution," and "Safety, Environmental and Training"), Ex. 15 at NISOURCE000499–500 (noting presentations from Senior Vice President for "Safety, Environmental and Training); Dkt. 32, Ex. 16 at NISOURCE000575–577 (noting presentations from COO, Executive Vice President for "Regulatory Policy and Corporate Affairs," and Senior Vice Presidents for "Gas Operations," "Corporate Affairs," and "Safety, Environmental and Training"), Ex. 17 at NISOURCE000650–51 (noting presentations from Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training"), Ex. 19 at NISOURCE000733–35 (noting presentations from Executive Vice President for "Safety, Capital Execution and Technical Services" and Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training"), Ex. 20 at NISOURCE000847–48 (noting presentations from NIPSCO's President, NiSource's Executive Vice President for

of its activities during Board meetings.[12]

### B. The Regulatory Framework And Safety Standards

NiSource is subject to federal regulations governing both natural gas companies and pipeline operators.

The Pipeline Safety Act establishes minimum safety standards for natural gas companies.[13] Under the Pipeline Safety Act, the U.S. Department of Transportation (the "DOT") is charged with promulgating federal regulations governing natural gas companies.

Pipeline operators are a subspecies of gas operators and are subject to an additional layer of federal regulations. The Pipeline and Hazardous Materials Safety Administration Act established the Pipeline and Hazardous Materials Safety Administration (the

---

"Safety, Capital Execution and Technical Services," and Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training"), Ex. 22 at NISOURCE001058–60 (noting presentations from NIPSCO's Senior Vice President and Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training"), Ex. 23 at NISOURCE001108–110 (noting presentations from NIPSCO's Senior Vice President, NiSource's Senior Vice Presidents for "Gas Operations" and "Safety, Environmental and Training," and Vice President for "Gas Engineering and Pipeline Safety"), Ex. 25 at NISOURCE001175–76 (noting presentations from NIPSCO's Senior Vice President, NiSource's Executive Vice President for "Safety, Capital Execution and Technical Services," and Senior Vice President for "Safety, Environmental and Training"), Ex. 26 at NISOURCE001286–88 (noting presentations from NIPSCO's President, NiSource's Executive Vice President for "Safety, Capital Execution and Technical Services," and Senior Vice President for "Safety, Environmental and Training").

[12] *See, e.g.*, Dkt. 30, Ex. 6 (minutes of January 27–29, 2016 Board meeting) at NISOURCE000014; Dkt. 31, Ex. 14 (minutes of January 25–27, 2017 Board meeting) at NISOURCE000471; Dkt. 32, Ex. 18 (minutes of May 9, 2017 Board meeting) at NISOURCE000700, Ex. 21 (minutes of January 24–26, 2018 Board meeting) at NISOURCE000970.

[13] Am. Compl. ¶ 35.

"PHMSA"), a federal agency within the DOT.[14] The PHMSA promulgates federal pipeline safety standards intended to provide for the safe, reliable, and environmentally sound operation of the U.S. pipeline transportation network. These regulations are codified in Part 192 of Title 49 of the Code of Federal Regulations ("Part 192").

Part 192 sets forth minimum federal safety standards for transporting gas by pipeline, including extensive recordkeeping requirements.[15] Section 603 of Part 192 requires that a gas operator maintain certain records.[16] Subsection 605(a) requires gas operators to "prepare and follow" an operation and maintenance manual ("O&M Manual") "for each pipeline."[17] Subsection 605(b) requires the O&M Manual to detail procedures for "starting up and shutting down any part of the pipeline in a manner designed to assure operation within the . . . limits prescribed" so as to ensure "safety during maintenance and operations."[18] Section 605(b) further requires that the O&M Manual include procedures

---

[14] *Id.* ¶ 37.

[15] *See* 49 C.F.R. § 192.1(a) (2022); *see also id.* § 192.9 (setting forth requirements for operators of "gathering pipelines," including certain record-keeping requirements); *id.* § 192.12 (setting forth regulations for underground natural gas storage facilities, including certain record-keeping requirements); *id.* § 192.605(b)(3) (requiring each operator to have certain procedures in place "to provide safety during maintenance and operations," such as "[m]aking construction records . . . available to appropriate operating personnel"); *id.* § 192.614(c)(3) (requiring a damage prevention program that must include "a means of receiving and recording notification of planned excavation activities"); *id.* at § 192.631(j)(1) (requiring that an operator maintain "[r]ecords that demonstrate compliance with the requirements of this section" on "control room management").

[16] *Id.* § 192.603(b).

[17] *Id.* § 192.605(a).

[18] *Id.* § 192.605(b)(5).

for "[m]aking construction records, maps, and operating history available to appropriate operating personnel."[19]

In addition to federal regulations, state regulatory agencies implement and enforce pipeline safety requirements for intrastate pipelines, and those state standards may be more stringent than federal standards. In Massachusetts, state law requires compliance with the federal standards imposed by PHMSA.[20]

The pipeline industry also looks to non-governmental entities for safety standards. In 2015, the American Petroleum Institute issued a recommended practice on the subject of pipeline safety management ("RP 1173").[21] RP 1173 was developed with input from PHMSA and the NTSB, among others, to reach the industry goal of zero pipeline safety incidents.[22] RP 1173 "established the base requirement of pipeline safety management systems ['PSMS'] for organizations that operate pipelines for use in the hazardous liquids and gas industries."[23] RP 1173 is not positive law required by any regulatory body.[24]

NiSource was among the first natural gas utility companies to embrace RP 1173 but determined to deploy it among its subsidiaries on a sequential basis.[25] NiSource

---

[19] *Id.* § 192.605(b)(3).

[20] *See* Am. Compl. ¶ 39; 220 Mass. Code Regs. § 101.01 (2022).

[21] Am. Compl. ¶ 38.

[22] *Id.*

[23] *Id.*

[24] *See id.* (describing RP 1173 as "a recommended practice" developed by the American Petroleum Institute "with engagement and guidance from the NTSB and the PHMSA, among others").

[25] NTSB Rep. at 28.

8

implemented RP 1173 at a Virginia subsidiary in 2015 and at an Indiana subsidiary in late 2017, following a settlement with Indiana regulators. NiSource had not begun implementing RP 1173 in the CMA distribution system before the Greater Lawrence Explosions.

### C.    Events Leading To The Greater Lawrence Explosions

The Amended Complaint identifies instances of violations by NiSource subsidiaries of pipeline safety laws, including Part 192's documentation requirements, that pre-dated the Greater Lawrence Explosions. These historic violations are discussed in greater detail in the legal analysis. This section details the information specific to understanding the events and causes of the Greater Lawrence Explosions.

#### 1.    A Low-Pressure System

For context, there are two types of natural gas distribution systems used to distribute gas to customers: high-pressure and low-pressure. Both are used to deliver natural gas to customers for heating, cooking, and other domestic and industrial uses through underground mains and service lines. In both high-pressure and low-pressure systems, the gas is supplied from a high-pressure source and depressurized for customer use. In a high-pressure system, the gas is depressurized through a pressure regulator at the point of delivery to the individual customer. In a low-pressure system, the gas is depressurized at a regulator station and then distributed to multiple customers. Because there are no regulators at the point of delivery in a low-pressure system, an overpressure event can

affect many customers. "This is an inherent weakness of a low-pressure natural gas system."[26]

Installed in the 1900s with cast iron mains, CMA's system was a low-pressure system at the time of the Greater Lawrence Explosions. Like many low-pressure systems, CMA's system regulated gas pressure through a simple closed-loop control system, where sensing lines, also called "control lines," reported the pressure in the main back to the regulator station. This pressure regulator system is susceptible to what is referred to in engineering parlance as "a common mode failure," meaning that an overpressure event affecting multiple customers can occur due to a single failure, such as disconnecting a sensing line.[27]

### 2.     The Control Line Documentation

The eleven full-time technicians comprising CMA's Measurement and Regulation ("M&R") Department were responsible for CMA's control lines. Although M&R employees had "extensive institutional knowledge about sensing line locations,"[28] CMA's sensing line documentation was suboptimal.

As one M&R supervisor explained, "[e]xcept for the newest stations, there's no . . . drawings of control [sensing] lines."[29] The employees frequently consulted "legacy

---

[26] *Id.* at 5.

[27] *Id.* at 40.

[28] *Id.* at 17.

[29] *Id.*

10

recordkeeping systems" which they referred to as "the old books" or their "bibles."[30]

Sometimes, the old books were inaccurate. Sometimes the old books were more accurate than more current drawings. The collection of records comprising CMA's sensing line documentation was maintained by six different personnel units in four different locations using multiple different forms of media.[31] Consequently "engineers would be required to visit multiple places to capture the true as-built configuration" of any CMA pipeline from the records.[32]

### 3. The South Union Street Project

CMA's century-old cast-iron pipeline was a serious problem, and both the Board and the public were well aware of it.[33] In 2014, the Massachusetts General Court enacted a law providing Massachusetts gas utility companies with a financial incentive to replace or modernize aging or leaking gas infrastructure. To obtain the financial incentives, gas

---

[30] *Id.*

[31] *See id.* at 17–18.

[32] *Id.* at 17.

[33] The Amended Complaint references an August 2015 *Boston Globe* article bearing the headline: "Project reveals 20,000 leaks in Mass. gas lines." Dkt. 33, Ex. 47. The article details how the leaks were "often the result of the corrosion of aging cast-iron pipes, some more than a century old, or construction accidents" and how ratepayers were charged for the leaked gas. *Id.* at 2. Although CMA was not specifically named in the article, CMA operated a significant portion of the gas pipeline system in Massachusetts described in the article. Am. Compl. ¶ 89. And that article was circulated years later in advance of an October 24, 2017 Board meeting, suggesting that it informed Board deliberation. *Id.* ¶ 90. This decision mentions the article because it featured in the Amended Complaint and briefing. Ultimately, however, it plays no role in the analysis, because the article discusses risks associated with aging pipelines generally, and Plaintiff's legal theory centers on risks associated with poor recordkeeping.

11

distribution companies were required to submit a plan to the Massachusetts regulatory agency for the removal of all leak-prone infrastructure within twenty years.

As part of CMA's plan to remove leak-prone infrastructure, beginning in 2016, CMA initiated an effort to replace 7,595 feet of cast iron and polyethylene mains with 4,845 feet of low-pressure and high-pressure mains on South Union Street in Lawrence, Massachusetts (the "South Union Street Project"). "To minimize service interruptions, normal maintenance and natural gas distribution system upgrades are typically performed with the system operating."[34] The South Union Street Project followed this approach and was performed with the system operating.

CMA required work packages for each construction project. The packages contained three types of documentation: a job order checklist, a project execution workflow, and a constructability safety review. Each of these documents was submitted, reviewed, and approved by a series of engineers with escalating credentials and experience. The constructability safety review is "a recognized and generally accepted good engineering practice . . . intended to provide an independent and structured review of construction plans and specifications to ensure there are no conflicts, errors, or omissions."[35] In general, CMA's engineering and construction departments were required to sign each constructability review.

---

[34] NTSB Rep. at 4.

[35] *Id.* at 16.

The South Union Street Project was supervised by a field engineer who in turn was supervised by a leader of field engineering ("LFE").[36] The field engineer was responsible for developing the work package, including two constructability reviews.[37] The first constructability review was signed in March 2016 and the second was finalized in December 2017. Each were signed by the LFE and other NiSource personnel.[38] Neither included signatures from personnel in the M&R department.[39]

Over-pressurization was a "known risk" that could result in a "catastrophic event,"[40] as explained in CMA's September 2, 2015 Operational Notice 15-05, titled "Below Grade Regulator Control Lines: Caution When Excavating Near Regulator Stations or Regulator Buildings" (the "Operational Notice").[41] The Operational Notice required personnel from the M&R Department to "be consulted on all future excavation work that was done within

---

[36] *See id.* at 18–19.

[37] *See id.* at 18 (describing the field engineer that "was responsible for developing and planning engineering modifications to the natural gas distribution system" and was "assigned to the South Union Street project"); *see also id.* at 20 (noting that "the director of field engineering indicated that he would expect the field engineers and the LFEs to work together to ensure that work packages were safely designed," with LFEs providing a "level of oversight"); *id.* at 19 ("After a preliminary estimate and preliminary design, the field engineering group meets with the construction group for a constructability review.").

[38] *See id.* at 19 ("The engineering review includes sign off by the LFE, the manager of field engineering, and the director of field engineering."); *id.* at 29 ("At the time of the accident, two NiSource employees who held [professional engineer] licenses were involved with the South Union Street project: the LFE and the director of field engineering. Their employment roles required both employees to review and sign off on the South Union Street project . . . .").

[39] *Id.* at 16.

[40] Am. Compl. ¶¶ 93–94.

[41] NTSB Rep. at 21.

25 feet of a regulator station" and to "stand by the regulator station throughout the excavation if there was a risk that the excavation project could damage any such line."[42] The South Union Street Project occurred over 2,000 feet away from a regulator station, so the M&R Department was not required to be on standby.

Nor did CMA require the M&R department to review every constructability review, despite the "known risk." Rather, "M&R department participation in constructability reviews was on a case-by-case basis."[43] If a job involved changing the design or location of a regulator, "M&R would likely be involved in the constructability review and meetings in the field."[44] There was an informal practice of "verbal communication" with M&R personnel concerning critical information, like control line issues.[45]

In alignment with this practice, no M&R personnel signed the South Union Street Project constructability reviews, but the field engineer and LFE informally consulted the M&R personnel. The field engineer who prepared the South Union Street Project's work package orally discussed control line issues with both the construction and M&R departments. From those conversations, he concluded that the "engineering department did not need to do anything further regarding sensing lines on the South Union Street [P]roject."[46]

---

[42] *Id.*

[43] *Id.* at 16.

[44] *Id.*

[45] Am. Compl. ¶ 95.

[46] NTSB Rep. at 20.

14

A construction leader who signed the constructability reviews sent an email on October 16, 2016, to an M&R employee providing notice that the project would involve work near a regulator station.[47] The construction leader also orally discussed the need to relocate the sensing lines with a contract inspector, and the two agreed to discuss the issue further "in more detail, with input from others."[48] One construction engineer who worked on the project stated that the construction foreman, crew, lead, and the local construction coordinator were all "aware of the need to relocate the sensing lines."[49]

Despite these discussions and interactions, neither the work package nor the constructability reviews prepared for the South Union Street project referred to sensing lines, and "there is no evidence that a work order or formal plan was ever developed to address the [sensing line] issue."[50] The director of field engineering explained that "we were short on readily available information around the sensing lines, the control lines."[51]

---

[47] *Id.* at 20–21.

[48] *Id.* at 21.

[49] *Id.*

[50] *Id.*; *see also id.* at 13 ("[N]o [work] package was prepared for the relocation of the Winthrop Avenue sensing lines from the cast iron main to the polyethylene main."); *id.* at 16 ("[T]he work package did not consider the existence of regulator sensing lines connected to the distribution lines that were slated to be abandoned within the scope of work. This omission was not identified by any of the CMA constructability reviews. In fact, none of the CMA workflow documents refer to natural gas distribution system pressure control nor do they refer to regulator control or sensing lines, and none of the documentation in the construction packages for the South Union Street project referred to sensing lines for regulator control.").

[51] *Id.* at 20.

**D.     The Greater Lawrence Explosions**

On September 13, 2018, CMA employees were upgrading and repairing a pipeline as part of the South Union Street Project.  While conducting repairs on the main pipeline, the CMA employees used a bypass pipe to keep gas flow continuous and prevent service disruptions.  None of the documents in the associated work packages addressed the relocation of key control lines.[52]

The CMA employees failed to remove and relocate the control lines to the bypass pipe.  The control lines detected no gas flow in the main pipeline and sent an erroneous signal that the pipe was experiencing a drop in pressure.  The signal prompted the system to increase the volume of natural gas.  This caused the lines to over-pressurize and fill homes and businesses with explosive volumes of gas.  The impact of the over-pressurization event was immediate and tragic.  When that gas met with an ignition source, it triggered the Greater Lawrence Explosions.

The Greater Lawrence Explosions caused fires that destroyed five homes and damaged 131 structures.  An eighteen-year-old was killed when a home exploded and its chimney fell onto the vehicle in which  he was sitting.  Another person in the vehicle was seriously injured, as was someone on the second floor of the house.  A total of 22 people, including three firefighters, were transported to local hospitals due to injuries.  Some of the victims had to be hospitalized because they could not return to their homes.  Service was not fully restored to some customers until December 2018.

---

[52] *See id.* at 13, 16, 21.

16

The heroic efforts of first responders offer some perspective into the magnitude of the catastrophe. The fires exhausted the resources of three separate municipal fire departments, and a total of 236 firefighters responded within thirty minutes of the explosions. The Massachusetts Emergency Management Agency activated the Fire Mobilization Plan, which involved 15 task forces across the state, and caused over 180 fire department and 140 law enforcement agencies to respond to the scene. During the 24 hours that followed the explosion, Massachusetts State Police dispatched over 200 officers to the affected areas. Five shelters were set up in three cities to receive displaced people from among 50,000 residents who were asked to evacuate.

## E.     The NTSB Investigation

Immediately following the tragic events, the NTSB investigated the Greater Lawrence Explosions. The NTSB's mandate includes investigating safety accidents, determining probable causes of the accidents, issuing safety recommendations, studying safety issues, and evaluate the effectiveness of relevant government agencies.[53]

On November 14, 2018, while its investigation was ongoing, the NTSB "issued five urgent safety recommendations to address the imminent threat to life [and] safety created by the conditions discovered thus far."[54] Four of those safety recommendations were issued directly to NiSource. The NTSB recommended that NiSource:

> Revise the engineering plan and constructability review
> process across all of your subsidiaries to ensure that all

---

[53] *Id.* at Abstract. The NTSB does not assign fault or blame; its investigations are not for the purpose of determining the rights or liabilities of any person. *Id.*

[54] Am. Compl. ¶ 10; *see also* Dkt. 24, Ex. C at 7.

17

applicable departments review construction documents for accuracy, completeness, and correctness, and that the documents or plans be sealed by a professional engineer prior to commencing work.

Review and ensure that all records and documentation of your natural gas systems are traceable, reliable, and complete.

Apply management of change process to all changes to adequately identify system threats that could result in a common mode failure.

Develop and implement control procedures during modifications to gas mains to mitigate the risks identified during management of change operations. Gas main pressures should be continually monitored during these modifications and assets should be placed at critical locations to immediately shut down the system if abnormal operations are detected.[55]

Two issues warrant further discussion. First, NTSB faulted NiSource's constructability review because the field engineer developed plans "without reviewing engineering drawings that documented the regulator-sensing lines," "had limited knowledge about the importance of the regulator-sensing lines," and determined that the M&R department was "not required to review the project."[56] The NTSB believed that a comprehensive constructability review, where all departments reviewed the project with approval of an engineer, "would likely have identified the omission of the regulator-sensing lines, thereby preventing the error that led to the accident."[57]

---

[55] Dkt. 24, Ex. C at 7.

[56] *Id.* at 3.

[57] *Id.*

Second, the NTSB believed that recordkeeping problems contributed to the Greater Lawrence Explosions because "the engineering plans used during the construction work did not document the location of regulator-sensing lines," and the work package "did not indicate the location of the regulator-sensing lines."[58]  The NTSB concluded that "[h]ad accurate alignment sheets with comprehensive system information been available and used during the construction project, engineers and work crews would have been able to identify the regulator-sensing lines and ensure their relocation prior to abandoning the pipeline main."[59]

In its final report, adopted on September 24, 2019, the NTSB concluded that "NiSource displayed an informal, unstructured approach for documenting this critical project" and that "inadequate planning, documentation, and recordkeeping processes led to [the Greater Lawrence Explosions]."[60]

F.    Criminal And Regulatory Sanctions

The Massachusetts Attorney General separately investigated the Greater Lawrence Explosions.  NiSource settled the investigation in July 2020, agreeing to pay $56 million in lieu of penalties to be used to create a relief fund.

The United States Attorney for the District of Massachusetts (the "USAO") investigated and ultimately charged CMA with criminal violations of portions of the

---

[58] *Id.* at 4.

[59] *Id.* at 5.

[60] NTSB Rep. at 42.

Natural Gas Pipeline Safety Act. CMA pled guilty and agreed to pay a $53 million fine along with restitution in February 2020.

NiSource and the USAO entered into a Deferred Prosecution Agreement (the "DPA"). Under the DPA, NiSource agreed to divest its interest in CMA and was precluded from profiting from the divestment.

The DPA also required a court-appointed "Independent Monitor" to monitor NiSource's and CMA's compliance with the DPA's terms. James Hall of Hall & Associates LLC was appointed as Independent Monitor. Hall's Final Report, dated October 6, 2020, stated that "certain safety deficiencies exist at CMA as a result of the governance by the parent company [NiSource]" and that "[l]eadership failed to prevent the safety lapses that led to the accident, and then failed to expedite corrective safety actions after the event."[61]

The DPA and guilty plea required NiSource to implement a PSMS (as recommended by RP 1173) across all NiSource gas subsidiaries, and NiSource began efforts to do so "enterprise wide" in October 2018.[62] NiSource also made unprompted changes following the Greater Lawrence Explosions. Management took steps to "improv[e] system knowledge and increase[e] system integrity across all of the

---

[61] Dkt. 33, Ex. 51 at 27. The report stated, however, that "the Monitor has been encouraged by CMA's new leadership efforts to address these identified safety concerns." *Id.*

[62] Am. Compl. ¶¶ 151, 155; *see also id.* ¶ 156 ("[The] post-Greater Lawrence Explosion[s] Board documents confirm the Board's belated and forced adoption of a RP 1173 recommended SMS safety system across all its Gas Subsidiaries to address its violations of Part 192, including critical documentation issues.").

Corporation's operating subsidiaries" and designed and installed "additional overpressure protection[s]" through changes to "operating policies, procedures, work practices, and damage prevention practices."[63] Further, the Board directed two changes in employee policies aimed at preventing future accidents like the Greater Lawrence Explosions. First, the Board required that "each custom design will be reviewed by at least one engineering peer and lead of the design engineering group, and will be assess [sic] for constructability and authorized by director of engineering and director of compliance prior to installation."[64] Second, the Board required that "[a]ll buried tap locations will be permanently marked . . . and [d]rawings will be applied to GIS database and stored at the station . . . ."[65]

## G. This Litigation

In April 2020, City of Detroit Police and Fire Retirement System ("Plaintiff") filed a derivative suit in the United States District Court for the District of Delaware alleging a federal securities violation under Section 14(a) of the Securities Exchange Act and a state law claim for breach of fiduciary duty under the *Caremark* doctrine.[66] The District Court dismissed the federal securities claim and the *Caremark* claim, without prejudice, due to lack of subject matter jurisdiction.[67]

---

[63] *Id.* ¶ 152.

[64] *Id.* ¶ 153.

[65] *Id.*

[66] *See* Dkt. 30, Ex. 1 at 3.

[67] *Id.* at 13–15.

Plaintiff refiled the *Caremark* claim in this court on April 29, 2021. On August 26, 2021, Plaintiff filed the Amended Complaint. The Amended Complaint names as defendants NiSource's CEO and director Joseph Hamrock; directors Peter Altabef, Theodore Bunting, Jr., Eric Butler, Aristedes Candris, Wayne DeVeydt, Deborah Henretta, Michael Jesanis, Kevin Kabat, and Carolyn Woo; and former director Richard Thompson (collectively, "Defendants"). Defendants comprised the Board during the relevant period.

On September 10, 2021, Defendants moved to dismiss the Amended Complaint. The parties fully briefed this motion on January 10, 2022.[68] The court heard oral argument on February 3, 2022.[69]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Amended Complaint under Court of Chancery Rule 23.1 for failure to plead demand futility.

"A cardinal precept of [Delaware law] is that directors, rather than shareholders, manage the business and affairs of the corporation."[70] "In a derivative suit, a stockholder

---

[68] Dkt. 29 ("Defs.' Opening Br."); Dkt. 35 ("Pl.'s Ans. Br."); Dkt. 39 ("Defs.' Reply Br.").

[69] Dkt. 44 (Oral Arg. Tr.).

[70] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested a deferential appellate review. *See id.* at 253 & n.13 (overruling in part on this issue *Scattered Corp. v. Chi. Stock Exch., Inc.*, 701 A.2d 70, 72–73 (Del. 1997); *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 473 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and

22

seeks to displace the board's authority over a litigation asset and assert the corporation's claim."[71] Because derivative litigation impinges on the managerial freedom of directors in this way, "a stockholder only can pursue a cause of action belonging to the corporation if (i) the stockholder demanded that the directors pursue the corporate claim and they wrongfully refused to do so or (ii) demand is excused because the directors are incapable of making an impartial decision regarding the litigation."[72] The demand requirement is a substantive principle under Delaware law.[73] Rule 23.1 is the "procedural embodiment of this substantive principle."[74]

Under Rule 23.1, stockholder plaintiffs must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[75] Stockholders choosing to allege demand futility must meet the "heightened pleading requirements,"[76] alleging "particularized factual statements that are

---

plenary. 746 A.2d at 253–54. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Although the technical rules of legal citation would require noting that each was reversed on other grounds by *Brehm*, this decision omits the subsequent history, which creates the misimpression that *Brehm* rejected core elements of the Rule 23.1 canon.

[71] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 250 A.3d 862, 876 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (2021).

[72] *Id.*

[73] *Id.*; *see* Ct. Ch. R. 23.1(a).

[74] *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993).

[75] Ct. Ch. R. 23.1(a).

[76] *Zuckerberg*, 250 A.3d at 876.

essential to the claim."[77]  "Plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences."[78]

Recently, the Delaware Supreme Court affirmed *Zuckerberg* and thereby adopted Vice Chancellor Laster's "universal test" for demand futility that blends elements of the two precursor tests: *Aronson*[79] and *Rales*.[80]  When conducting a demand futility analysis under *Zuckerberg*, Delaware courts ask, on a director-by-director basis:

> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[81]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[82]  While the *Zuckerberg* test displaced the prior

---

[77] *Brehm*, 746 A.2d at 254.

[78] *Id.* at 255.

[79] 473 A.2d 805 (Del. 1984).

[80] 634 A.2d 927 (Del. 1993).

[81] *United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (quoting *Zuckerberg*, 250 A.3d at 890).

[82] *Id.*

24

tests from *Aronson* and *Rales*, cases properly applying *Aronson* and *Rales* remain good law.[83]

When Plaintiff initiated this action, the Board comprised twelve directors. To adequately allege demand futility, Plaintiff must plead particularized facts creating reason to doubt that at least six directors of the twelve are capable of impartially considering a demand.[84]

To meet this burden, Plaintiff focuses on the second prong of *Zuckerberg*, arguing that demand is futile because ten of NiSource's twelve directors face a substantial likelihood of liability based on the claims that would be the subject of the litigation demand.

Where, as here, a plaintiff's basis for arguing demand futility centers on a substantial likelihood of liability resulting from the derivative claims at issue, the demand analysis effectively folds into an analysis of the strength of the underlying claims. In this case, therefore, the *Zuckerberg* analysis hinges on whether Plaintiff has adequately alleged its "*Caremark* claim."

A *Caremark* claim "seeks to hold directors accountable for the consequences of a corporate trauma."[85] To adequately allege such a claim, a plaintiff must allege that the

---

[83] *Id.*

[84] *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 989–90 (Del. Ch. 2007) ("Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand.").

[85] *La. Mun. Police Empls.' Ret. Sys. v. Pyott,* 46 A.3d 313, 340 (Del. Ch. 2012), *rev'd on other grounds*, 74 A.3d 612 (Del. 2013); *see also Horman v. Abney*, 2017 WL 242571, at *5 (Del. Ch. Jan. 19, 2017) ("*Caremark* claims inevitably arise in the midst of or directly following 'corporate trauma' of some sort or another."); *Melbourne Mun. Firefighters'*

board had some level of involvement in the trauma.[86]  *Caremark* describes the test as requiring that the directors "knew or . . . should have known" about the risk leading to the trauma.[87]  *Stone* clarified that liability under *Caremark* requires a showing of bad faith— "that the directors knew that they were not discharging their fiduciary obligations."[88]  At the pleading stage, the plaintiff must allege facts from which the court can reasonably infer that a fiduciary acted in bad faith.[89]  That requirement flows both from the *Caremark* standard and from the exculpatory provision in NiSource's Certificate of Incorporation.[90]

*Stone* identified two subspecies of *Caremark* claims.  To state a *Caremark* claim, a plaintiff must allege particularized facts that establish either (1) "the directors utterly failed to implement any reporting or information system or controls, *or* [(2)] having implemented such a system or controls, consciously failed to monitor or oversee its operations thus

---

*Pension Tr. Fund v. Jacobs*, 2016 WL 4076369, at *7 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (quoting *Pyott*).

[86] *Pyott*, 46 A.3d at 340.

[87] *Caremark*, 698 A.2d at 971.

[88] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Pyott*, 46 A.3d at 340–41 (discussing the "actual knowledge" requirement of *Caremark* as clarified by *Stone*).

[89] *Marchand v. Barnhill*, 212 A.3d 805, 820–21 (Del. 2019) (quoting *Desimone v. Barrows*, 924 A.2d 908, 935 (Del. Ch. 2007)).

[90] *See Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003); *Reiter v. Fairbank*, 2016 WL 6081823, at *7 (Del. Ch. Oct. 18, 2016); *Fisher v. Sanborn*, 2021 WL 1197577, at *9 (Del. Ch. Mar. 30, 2021).

disabling themselves from being informed of risks or problems requiring their attention."[91]

These two subspecies are colloquially referred to as prong-one and prong-two claims.[92]

In this case, Plaintiff advances both types. A plaintiff who adopts that strategy typically loses on prong one because the plaintiff must concede the existence of a board-level monitoring system to plead under prong two that the board ignored red flags generated by that system.[93] Plaintiff falls into that trap here. Impliedly admitting the weakness of its prong-one claim, Plaintiff positions its prong-one arguments second in briefing. The question of whether the Board had a monitoring system, however, logically precedes the inquiry concerning whether the Board ignored information generated by that system. This decision thus addresses Plaintiff's prong-one claim first and dispatches it with some ease. This decision then turns to Plaintiff's more nettlesome prong-two claim.

### A.    The Prong-One Claim

To adequately allege a prong-one *Caremark* claim, a plaintiff must plead with particularity that directors completely failed "to implement any reporting or information

---

[91] *Stone*, 911 A.2d at 370 (emphasis in original).

[92] *See Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020).

[93] *See, e.g.*, *Fisher*, 2021 WL 1197577, at *11 (dismissing *Caremark* prong-one claim where "[p]laintiff's own brief concedes" the existence of a board-level monitoring system thus foreclosing a prong-one claim); *In re LendingClub Corp. Deriv. Litig.*, 2019 WL 5678578, at *9–10 & n.59 (Del. Ch. Oct. 31, 2019) (same); *Rojas v. Ellison*, 2019 WL 3408812, at *9 (Del. Ch. July 29, 2019) (same); *In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *14 (Del. Ch. June 26, 2015) (same), *aff'd*, 133 A.3d 971 (Del. 2016); *South v. Baker*, 62 A.3d 1, 18 (Del. Ch. 2012) (same).

system or controls."[94]  In the words of *Caremark*, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability."[95]  When adopting a version of this quote as the prong-one standard, the *Stone* court was "quite deliberate" in endorsing the adverb "utterly"—a "linguistically extreme formulation" intended "to set a high bar when articulating the standard to hold directors personally liable for a failure of oversight under the first Caremark prong."[96]  This high bar serves to gives boards a wide berth to exercise that discretion with respect to business risk.  As the Delaware Supreme Court recently reminded, "directors have great discretion to design context- and industry-specific approaches tailored to their companies' businesses and resources."[97]

Although a board has great latitude in crafting and implementing its risk-monitoring and reporting system, "*Caremark* does have a bottom-line requirement that is important: the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting."[98]  To avoid rendering this bottom-line requirement "a chimera,"[99] this court must look beyond the mere existence of a system to some indicia

---

[94] *Marchand*, 212 A.3d at 821 (citing *Stone*, 911 A.2d at 370).

[95] *Caremark*, 698 A.2d at 971.

[96] *Fisher*, 2021 WL 1197577, at *12 (quoting *Horman*, 2017 WL 242571, at *8 n.46).

[97] *Marchand*, 212 A.3d at 821.

[98] *Id.* (citations omitted).

[99] *Id.* at 824.

of effectiveness when determining whether a board made the required good faith effort.[100]

The court must evaluate, for example, whether the system functions in earnest, as oversight

requires more than just "go[ing] through the motions."[101] Moreover, the system must be

[100] *See, e.g.*, *Hughes v. Hu*, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) ("The mere existence of an audit committee and the hiring of an auditor does not provide universal protection against a *Caremark* claim."); *Rich v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013) (holding that the plaintiff had adequately alleged a *Caremark* claim, despite the existence of an audit committee and independent auditor, where the company had not "meaningful controls in place").

[101] *Compare Massey*, 2011 WL 2176479, at *19 (crediting inference that independent directors were "go[ing] through the motions" instead of "mak[ing] good faith efforts" to ensure compliance), *and Pyott*, 46 A.3d at 356 (noting that "[t]he appearance of formal compliance cloaked the reality of non-compliance" when "directors who understood the difference between legal off-label sales and illegal off-label marketing continued to approve and oversee business plans that depended on illegal activity") (citing *Massey*), *with Horman*, 2017 WL 242571, at *8 (rejecting inference that "Director Defendants were 'merely going through the motions' in monitoring [the company's] compliance obligations").

Notwithstanding this reality, Delaware courts typically have sustained a prong-one claim based on the plaintiff adequately alleging that there was no board level monitoring and reporting system or such a woeful system as to effectively constitute the absence of one. *See, e.g.*, *Hughes*, 2020 WL 1987029, at *14 (holding that a prong-one claim was adequately alleged where the "complaint alleges facts that support an inference that the Company's Audit Committee met sporadically, devoted inadequate time to its work, had clear notice of [the financial irregularities at issue], and consciously turned a blind eye to their continuation"); *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *19 (Del. Ch. May 21, 2013) (holding that a prong-one claim was adequately alleged where, among other things, there was no "documentary evidence that the Audit Committee ever held a single meeting during [the] two year period" after the company had disclosed material weaknesses in its disclosure controls and procedures, suggesting that the Audit Committee "existed in name only"); *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *1 (Del. Ch. Dec. 21, 2006) (holding that a prong-one claim was adequately alleged where it was reasonably conceivable the directors "failed to take any steps to monitor [the controller] and prevent his self-dealing" and "regarded themselves as mere employees of [the controller]"), *aff'd*, 930 A.2d 928 (Del. 2007) (TABLE); *see also Rich*, 66 A.3d at 983 (concluding that, despite existence of audit committee and independent auditor, the company "had no *meaningful* controls in place"); *Guttman*, 823 A.2d at 507 (observing that a *Caremark* claim might include "contentions that the company lacked an

29

"reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board . . . to reach informed judgments concerning both the corporation's compliance with law and its business performance."[102]

The Delaware Supreme Court clarified in *Marchand* that a reasonably designed monitoring and reporting system, at a minimum, addresses "mission critical" risks.[103] In *Marchand*, the ice cream manufacturer Blue Bell Creameries USA, Inc. suffered a listeria outbreak that required a massive product recall, shut down production, and killed three people. The plaintiff filed claims to hold the Blue Bell board accountable for the corporate trauma resulting from the listeria outbreak, advancing as its principal argument a prong-one theory that the company lacked board-level reporting systems sufficient to satisfy *Caremark*'s baseline requirements.

The trial court granted the defendant's Rule 23.1 motion, observing that the complaint described "at length the intense regulatory scrutiny" under which the company

<hr>

audit committee, that the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation"); *David B. Shaev Profit Sharing Acct. v. Armstrong*, 2006 WL 391931, at *5 (Del.Ch. Feb. 13, 2006) (observing that "a plaintiff can allege that a board violated its fiduciary duty by utterly failing to exercise oversight of the corporation, such as by failing to assure the existence of reasonable information and reporting systems" which "might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, or that a formally constituted audit committee failed to meet") (citing *Guttman*, 823 A.2d at 507).

[102] *Caremark*, 698 A.2d at 970.

[103] *Marchand*, 212 A.3d at 824.

operated, and affirmatively alleged that the company distributed a "sanitation manual with standard operating and reporting procedures, and promulgated written procedures for processing and reporting consumer complaints."[104] The court further observed that the company's Vice President of Plant Operations was responsible for operations, reported directly to the CEO, and with the CEO provided regular reports to the board and the company's independent safety auditor.[105] These allegations led the court to conclude that the plaintiff "really attempts to challenge . . . not the *existence* of monitoring and reporting controls, but the *effectiveness* of monitoring and reporting controls in particular instances."[106] Citing the linguistically extreme formulation of *Caremark*'s first prong, the trial court concluded that "[t]his is not a valid theory."[107]

The Delaware Supreme Court reversed on appeal, rejecting the finding that the affirmative allegations of the complaint evidenced a monitoring and reporting system at Blue Bell sufficient to satisfy *Caremark*. The thematically dominant consideration driving the high court's analysis was that "[f]ood safety was essential and mission critical" to the company.[108] Despite the mission-critical nature of food safety, Blue Bell left compliance with food safety issues to management and received reports on food safety only at management's discretion.

---

[104] *Marchand v. Barnhill*, 2018 WL 4657159, at *17 (Del. Ch. Sept. 27, 2018), *rev'd*, 212 A.3d 805 (2019).

[105] *Id.* at *18.

[106] *Id.* (emphasis in original).

[107] *Id.*

[108] *Marchand*, 212 A.3d at 824.

The Delaware Supreme Court also emphasized that merely fulfilling regulatory requirements imposed by governmental authorities was not necessarily enough. Blue Bell was regulated by the Food and Drug Administration, and the procedures that the trial court cited complied with FDA requirements. The Delaware Supreme Court rejected that showing as insufficient:

> [T]he fact that Blue Bell nominally complied with FDA regulations does not imply that the board implemented a system to monitor food safety at the board level. Indeed, these types of routine regulatory requirements, although important, are not typically directed at the board. At best, Blue Bell's compliance with these requirements shows only that management was following, in a nominal way, certain standard requirements of state and federal law. It does not rationally suggest that the board implemented a reporting system to monitor food safety or Blue Bell's operational performance. The mundane reality that Blue Bell is in a highly regulated industry and complied with some of the applicable regulations does not foreclose any pleading-stage inference that the directors' lack of attentiveness rose to the level of bad faith indifference required to state a Caremark claim.[109]

The *Marchand* court concluded that "[a]lthough *Caremark* may not require as much as some commentators wish, it does require that a board make a good faith effort to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks."[110] *Marchand* has since been interpreted by this court as standing for the proposition that "when a company operates in an environment where externally

---

[109] *Id.* at 823.

[110] *Id.*

imposed regulations govern its 'mission critical' operations, the board's oversight function must be more rigorously exercised."[111]

Vice Chancellor Zurn recently applied *Marchand* when denying a motion to dismiss a prong-one claim in *Boeing*.[112] There, an airplane manufactured by Boeing crashed in October 2018. A second one crashed in March 2019. Both crashes killed everyone on board. They also caused Boeing to lose billions of dollars. Stockholder plaintiffs filed suit against the Boeing board, advancing a prong-one *Caremark* claim as to events that

---

[111] *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13 (Del. Ch. Oct. 1, 2019); *see also In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *26 & n.244 (Del. Ch. Sept. 7, 2021) (same, quoting *Clovis*). Some interpret *Marchand* as ushering in a new "stricter *Caremark* era." *See*, *e.g.*, Roy Shapira, *A New* Caremark *Era: Causes and Consequences*, 98 Wash. U.L. Rev. 1857, 1864, 1892–94 (2021) (noting that *Marchand* and its progeny led a "new *Caremark* era" aimed at combating three problems: (1) "[p]romoting individual accountability," (2) "[f]ighting recidivism," and (3) "[f]ighting information underproduction"); Roy Shapira, *Mission Critical ESG and the Scope of Director Oversight Duties*, 2022 Colum. Bus. L. Rev. (forthcoming 2022) (manuscript at 11) ("[T]he new *Caremark* era rests on two pillars: (1) increased willingness to apply enhanced scrutiny of board oversight, via the 'mission critical' designation, and (2) increased willingness to grant outside shareholders access to internal company documents, in order to investigate potential failure-of-oversight claims."). The use of "enhanced scrutiny" in this context is misleading, as that term already has a settled meaning under Delaware law. It is a standard of review that applies in "specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013). Framed generally, enhanced scrutiny requires that fiduciary defendants "bear the burden of persuasion to show that their motivations were proper and not selfish" and that "their actions were reasonable in relation to their legitimate objective." *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007). Generally speaking, even after *Marchand*, Delaware courts are not applying reasonableness review in *Caremark* cases.

[112] *Boeing*, 2021 WL 4059934, at *26.

preceded the first crash, and a prong-two *Caremark* claim as to events that occurred in between the crashes.

In addressing the prong-one claim, the Vice Chancellor observed that the deficiencies alleged in *Boeing* tracked the deficiencies sufficient to support a prong-one claim in *Marchand*. She reasoned that airplane safety was mission critical to Boeing, just as food safety was to Blue Bell. The Boeing board, like the Blue Bell board, failed to empower a board committee tasked with monitoring and reporting on a mission-critical safety risk and relied solely on discretionary of "ad hoc" reports of management. Compounding this problem, management's reports were "one-sided at best and false at worst."[113] These and other striking deficiencies led the Vice Chancellor to conclude that the Boeing board failed to satisfy the bottom-line requirement of *Caremark*.

In this case, Plaintiff does not allege that board-level reporting on mission critical risks was discretionary. Nor does Plaintiff allege a system that merely checked the boxes required by pertinent regulatory authorities without addressing the need for board-level systems or committee-level action. Indeed, Plaintiff concedes that the Board formed the ES&S Committee to oversee and report on safety policies, practices, and performance.[114] And the documents incorporated by reference in the Amended Complaint reflect that the ES&S Committee tried to fulfill its charge—meeting five times a year,[115] receiving

---

[113] *Id.* at *31.

[114] Am. Compl. ¶ 184.

[115] *Id.* ¶ 185; *see, e.g.*, Dkt. 30, Ex. 7 (ES&S Committee meeting minutes for January 28, 2016); Dkt. 31, Ex. 8 (ES&S Committee meeting minutes for March 21, 2016), Ex. 9 (ES&S Committee meeting minutes for May 10, 2016), Ex. 11 (ES&S Committee meeting

extensive reports from senior executives,[116] and regularly reporting on safety risks to the full Board.[117] The E&S Committee was not a committee "in name only."[118]

Plaintiff instead makes a more nuanced argument targeting the effectiveness of NiSource's monitoring and reporting system. Plaintiff argues that the Board and ES&S Committee monitored risk in a generic way only and improperly failed to focus on the specific, mission critical risk that mattered—pipeline safety.[119] Parroting *Marchand* and *Boeing*, Plaintiff contends that the oversight system established by the Board was insufficiently rigorous in addressing that specific, mission-critical risk.[120]

It is fair to conclude that pipeline safety is to a pipeline operating company what airplane and food safety are to airplane and food companies—mission critical. But

---

minutes for August 8, 2016), Ex. 12 (ES&S Committee meeting minutes for October 24, 2016).

[116] Am. Compl. ¶ 151; *see, e.g.*, Dkt. 31, Ex. 12 (noting that NiSource's Board Chairman, CEO, CFO, Chief Legal Officer, and executives of subsidiaries, among others, attended the October 24, 2016 ES&S Committee meeting).

[117] *See, e.g.*, Dkt. 30, Ex. 6 at NISOURCE000014 (Board received report from ES&S Committee on January 27. 2016); Dkt. 31, Ex. 14 at NISOURCE000471 (Board received report from ES&S Committee on January 27, 2017); Ex. 18 at NISOURCE000700 (Board received report from ES&S Committee on May 9, 2017); Ex. 21 at NISOURCE000970 (Board received report from ES&S Committee on January 24, 2018).

[118] *See China Agritech*, 2013 WL 2181514, at \*19 (finding that the audit committee in that case "existed in name only"); *see also Hughes*, 2020 WL 1987029, at \*14 (describing an audit committee that met "only when prompted by the requirements of the federal securities laws" and "regularly overlooked important issues").

[119] *See* Pl.'s Ans. Br. at 48–52.

[120] *Id.* at 47 (arguing that the Board's oversight extended merely to "monitoring of 'generic' safety matters," and that neither the Board nor any of its committees exercised "'rigorous' or 'active' oversight as to compliance with pipeline safety regulations").

35

Plaintiff's more nuanced argument nevertheless founders on the shoals of Plaintiff's affirmative allegations. The centerpiece of Plaintiff's prong-two claim is that that the Board and ES&S Committee specifically considered the precise pipeline safety laws at issue. For example, when advancing the prong-two argument in briefing, Plaintiff states that "the Board knew NiSource had critical safety problems related to compliance with Part 192's documentation requirements in Massachusetts, where CMA operated, as material from the March 21, 2016 ES&S Committee meeting noted that 'poor record[s]' were the root cause of 18% of CMA's damages during 2015."[121] Plaintiff likewise acknowledges that the Board and the ES&S Committee discussed an order from the Indiana Utility Regulatory Commission (the "IURC"), which signaled that NiSource's Indiana subsidiary, Northern Indiana Public Service Company ("NIPSCO"), "was repeatedly violating pipeline safety regulations, including Part 192's documentation standards," during their respective May 8 and May 9, 2017 meetings.[122]

When confronted with its own allegations demonstrating that the Board and ES&S Committee monitored and actively discussed the specific regulatory risks at issue, Plaintiff pivots. Effectively abandoning the argument that the board-level system focused on generic safety risks only, Plaintiff resorts to arguing that the "one-time discussion" during

---

[121] *Id.* at 15 (emphasis omitted) (citing Am. Compl. ¶¶ 99–100); *see also* Dkt. 31, Ex. 8 at NISOURCE000179.

[122] Pl.'s Ans. Br. at 49; *see also* Dkt. 32, Ex. 17 at NISOURCE000651 (May 8, 2017 ES&S Committee Meeting), Ex. 18 at NISOURCE000698–699 (May 9, 2017 Board meeting).

36

both May 2017 meetings is simply too infrequent to meet the standard of *Marchand*.[123]

But this argument diverges too dramatically from the high "utter failure" standard, even as understood through the refined lens of *Marchand* and *Boeing*. The bottom-line question that *Caremark* asks is whether the Board made a good faith effort to put in place a reasonable board-level system. Plaintiff's allegations demonstrate the existence of a system rather than its absence.

Moreover, as Defendants note, beyond the May 2017 discussion and references to Part 192's documentation requirements in the Board materials of that meeting, the Section 220 Documents are replete with other information suggesting that the Board and ES&S Committee monitored and reported on pipeline safety compliance.

- In January 2016, management informed the Board about a safety incident in Newcomerstown, Ohio, and presented information on company-wide and industry-wide gas safety incidents.[124]

- In March 2016, the ES&S Committee reviewed a safety incident in Littlestown, Pennsylvania, discussed "the potential causes of the gas leak and lessons learned" and recent efforts to "enhance[e] compliance and damage prevention," and reviewed "Key Learnings" from other gas safety incidents at NiSource and within the industry.[125]

- In May 2016, the ES&S Committee reviewed the "Corporation's Quality Assurance / Quality Control program" which "include[ed] recordkeeping and adherence to Corporation procedures and federal compliance programs."[126]

- In August 2016, the ES&S Committee reviewed a proposed PHMSA regulation including a summary of the proposed rule, a review of industry

---

[123] Pl.'s Ans. Br. at 49–50 (emphasis omitted).

[124] Dkt. 30, Ex. 6 at NISOURCE000005, -90–95.

[125] Dkt. 31, Ex. 8 at NISOURCE000125–26, -148, -165.

[126] Dkt. 31, Ex. 9 at NISOURCE000218.

safety events and regulatory responses, and forward-looking steps to comply with the proposed rule.[127]

- In October 2016, the ES&S Committee reviewed "two recent significant safety incidents, as well as the root cause analyses and corrective actions being undertaken."[128]

- In January 2017, the ES&S Committee reviewed a "significant safety incident . . . , the corrective actions taken, and the lessons learned," and reviewed a presentation entitled "Progression of NiSource Safety Program[s]."[129]

- In March 2017, the ES&S Committee reviewed a report focused on gas leaks and the "2016 modernization program" which reduced the prevalence of gas leaks.[130]

- In May 2017, the ES&S Committee discussed the notice of violation that NIPSCO received from the IURC and received information that NIPSCO was transitioning to two new locate contractors to "improve damage prevention safety performance."[131]

- In August 2017, the ES&S Committee "reviewed lessons learned from a peer utility's recent pipeline incident."[132]

- In October 2017, the ES&S Committee reviewed and discussed RP 1173 and implementation of a PSMS, including the "positive impact" of PSMSs and its effect on existing safety programs.[133]

- In January 2018, the ES&S Committee received a report on "gas pipeline safety" focused on winter operations.[134] The Board received and discussed a presentation on "Safety Management Systems," which discussed the

---

[127] Dkt. 31, Ex. 11 at NISOURCE000283–84, -318–28.

[128] Dkt. 31, Ex. 12 at NISOURCE000381.

[129] Dkt. 31, Ex. 15 at NISOURCE000500, -543.

[130] Dkt. 32, Ex. 16 at NISOURCE000576, -583–84.

[131] Dkt. 32, Ex. 17 at NISOURCE000651, -673.

[132] Dkt. 32, Ex. 19 at NISOURCE000734.

[133] Dkt. 32, Ex. 20 at NISOURCE000848.

[134] Dkt. 32, Ex. 22 at NISOURCE001060.

"regulatory landscape" and a "compliance and risk assessment," which covered "22 areas of pipeline risk or compliance requirements across all 7 [subsidiaries], including risks such as damage prevention, emergency response, workforce competency, [and] infrastructure quality."[135]

- In March 2018, the ES&S Committee reviewed a natural gas explosion in Texas and discussed "the use of data analytics and increased surveillance to manage pipeline safety risk."[136]

- In May 2018, the ES&S Committee "reviewed the progress of implementing the [PSMS]," and reviewed a summary of the causes and preventative actions associated with the Texas natural gas explosion.[137]

- In August 2018, the ES&S Committee reviewed and discussed the status of implementing a PSMS in Virginia.[138]

Plaintiff argues that the court should not consider this other evidence of specific attention to pipeline safety laws. Plaintiff argues, and it is true as a general matter, that "defendants cannot use documents outside the complaint, even minutes produced as part of the Section 220 Documents, to contest its well-pled allegations."[139] Here, Defendants do not rely on such documentation to dispute well-pled allegations in the Amended Complaint as to the prong-one claim. Defendants instead seek to defend against Plaintiff's cherry-picking—e.g., arguing that the Board only discussed pipeline safety laws twice because Plaintiff only alleged the existence of two such discussions. Pointing to the Section 220 documents in this way does not "rewrite" the Amended Complaint nor require

---

[135] Dkt. 32, Ex. 21 at NISOURCE001000–02, -05.

[136] Dkt. 32, Ex. 23 at NISOURCE001109.

[137] Dkt. 32, Ex. 25 at NISOURCE001176.

[138] Dkt. 32, Ex. 26 at NISOURCE001287.

[139] *Goldstein v. Denner*, 2022 WL 1671006, at *38 (Del. Ch. May 26, 2022).

39

inferences in Defendants' favor, as Plaintiff argues.[140] Rather, it provides obvious and relevant context that is fair game. It is perhaps a subtle distinction, but an important one.

In the end, it does not matter; Plaintiff's own concessions regarding the March 2016 and May 2017 meetings suffice to undermine its prong-one claim.

Accordingly, Plaintiff failed to adequately allege a claim for oversight liability under prong one of *Caremark*.

### B.  The Prong-Two Claim

Plaintiff advances two prong-two theories. First, Plaintiff draws an analogy to *In re Massey Energy Co.*, where this court held that causing a corporation to seek profit by violating the law supported a *Caremark* claim.[141] Plaintiff contends that the NiSource Board "made repeated business decisions to allow NiSource's Gas Subsidiaries to operate in violation of pipeline safety laws, rather than expend the necessary funds to ensure that these subsidiaries complied with those laws."[142] Second, Plaintiff argues that the Board ignored red flags "related to NiSource's Gas Subsidiaries' repeated violations of pipeline safety laws."[143] This decision refers to the first theory of liability as the "*Massey* Theory" and the second theory as the "Red-Flags Theory."[144]

---

[140] Pl.'s Ans. Br. at 53–55.

[141] 2011 WL 2176479, at * 21.

[142] Pl.'s Ans. Br. at 25 (citing Am. Compl. ¶ 226).

[143] *Id.* at 33.

[144] This decision places Plaintiff's *Massey* theory under the prong-two umbrella as Plaintiff has done, but reasonable minds can disagree on whether a claim that a board knowingly violating the law in search of profit qualifies an "utter failure" prong-one claim, a "red flag" prong-two claim, or a separate category on its own.

### 1.      The *Massey* Theory

In *Massey*, an explosion in one of Massey Energy Company's mines killed 29 miners and resulted in massive corporate loss. Only two years earlier, the company had pled guilty to multiple counts of willful criminal safety violations.[145] After the guilty plea, the number of safety violations at the company increased, with over 10,600 in the year before the explosion alone.[146]

The corporate trauma resulting from the deadly explosion at Massey drew stockholder-derivative claims under *Caremark* (the "Derivative Claims"). Massey later agreed to a merger with another mining company, which would extinguish the stockholders' standing to pursue the Derivative Claims. Massey stockholders responded by filing a new suit to enjoin the merger, arguing under *Parnes v. Bally Entertainment Corp.*[147] that the merger price was materially inadequate because it did not reflect the value of the Derivative Claims.

The procedural posture of *Massey* required then-Vice Chancellor Strine to determine whether the plaintiffs' *Parnes* claim had a reasonable probability of success on the merits. That, in turn, required the court to assess whether the Derivative Claims were adequately alleged. Although the court denied the motion for a preliminary injunction on the grounds that the Derivative Claims were not a material asset undervalued in the merger consideration, the court found that the Derivative Claims likely would have "survive[d] a

---

[145] *Massey*, 2011 WL 2176479, at *6.

[146] *Id.* at *7.

[147] 722 A.2d 1243 (Del. 1999).

41

motion to dismiss, even under the heightened pleading standard applicable under Rule 23.1."[148]

Then-Vice Chancellor Strine framed his discussion of the merits of the Derivative Claims with the following statement of law that is at the heart of Plaintiff's *Massey* Theory:

> Delaware law does not charter law breakers. Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue "lawful business" by "lawful acts." As a result, a fiduciary of a Delaware corporation cannot be loyal to a Delaware corporation by knowingly causing it to seek profit by violating the law.[149]

Based on these principles, the then-Vice Chancellor held that the plaintiff had adequately alleged a claim that the directors knowingly caused Massey to seek profit by violating the law where the plaintiffs alleged with particularity "a myriad" of startling facts creating a pleading-stage inference to that effect.[150] Specifically, the court held top-level management "knowingly caus[ed]" the company to violate the law, the company had pled guilty to willful criminal safety violations, and it tried "to hide violations of the law and suppress material evidence."[151] Further, the CEO had "disdain" for regulators, and "fostered a business strategy expressly designed to put coal production and higher profits over compliance with the law."[152] All this was after the CEO "pled guilty to criminal

---

[148] *Massey*, 2011 WL 2176479, at *21.

[149] *Id.* at *20.

[150] *Id.*

[151] *Id.*

[152] *Id.* at *19.

charges for willful violations of mining safety laws and falsification of evidence, settled a claim with the Environmental Protection Agency for a record sum, and suffered a punitive damages award for firing a whistleblower."[153] Finally, the CEO, who was the "public face" of Massey, "publicly stated that the idea that governmental safety regulators knew more about mine safety than he did was silly."[154]

Plaintiff here argues that NiSource's business model matches the extreme lawlessness of *Massey*, but that cannot be reasonably inferred from the Amended Complaint. *Massey* involved egregious facts that rightly led the court to suggest that the company made a business out of breaking the law. By contrast, the big picture here is that the NiSource Board had multiple committees dedicated to compliance risk and voluntarily took several concrete steps to implement a PSMS at multiple subsidiaries before the Greater Lawrence Explosions.

Specifically, the Board was directing a "state-by-state" initiative to replace the company's aging pipeline system and outdated record-keeping system.[155] NiSource was one of the first pipeline operators to embrace RP 1173 in 2015 at its Virginia gas subsidiary, and the ES&S Committee followed up on the implementation process.[156] NiSource

---

[153] *Id.*

[154] *Id.*; *see also id.* at *5 (noting that the CEO "took a combative approach with the key federal agency charged with enforcing . . . compliance with federal safety regulations" and "espous[ed] the belief that when it came to a miner's safety, [he] knew best").

[155] NTSB Rep. at 28.

[156] *Id.*; *see also* Dkt. 32, Ex. 26 at NISOURCE001287.

participated in the American Gas Association's "SMS project" in 2015.[157] The NTSB described NiSource's Board, management, and employees as "excited" about the development of a PSMS, and NiSource was focused on "building safety management systems around [RP-1173]."[158] NiSource conducted two "gap analyses" at the Virginia and Indiana subsidiaries to determine where gaps existed between the current safety systems and the planned PSMS.[159] NiSource added a manager, three specialists, and staff to support the PSMS implementation and help close the identified gaps.[160] In 2017, the Board accelerated the PSMS implementation plan to a three-year timeline.[161] The sum of these actions does not support an inference that the Board acted as a reckless and rampant law breaker akin to the board in *Massey*.

Plaintiff alleges generally that NiSource's subsidiaries, along with "industry peers," committed over 10,000 violations of pipeline safety laws annually, and federal regulators lacked the resources to adequately monitor the millions of miles of pipelines over which they had authority, making the Board's role to oversee NiSource's gas subsidiaries' compliance with those laws even more critical.[162] Presented in isolation, the figure of 10,000 violations per year seems striking, but that number has to be put in context. It

---

[157] NTSB Rep. at 28.

[158] *Id.*

[159] *Id.*; *see also id.* at 54.

[160] *Id.* at 54.

[161] *Id.*

[162] *See* Am. Compl. ¶¶ 47–52, 65–86, 111, 114–15.

matters how many potential regulatory violations there were and hence what level of frequency the violations represent. It also matters how serious the violations were. In any event, as Chancellor Allen recognized in *Caremark*, "no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations."[163] Even if the figure did support an inference of chronic regulatory violations across the entire industry, that fact standing alone would not support an inference that NiSource was lawless. There would need to be an additional showing that NiSource was part of the industry-wide problem.

Plaintiff's most particularized allegation in support of its *Massey* Theory is that the Board knew that the company-wide implementation of a PSMS as recommended by RP 1173—with the goal of eliminating all violations—would have improved compliance with pipeline safety laws.[164] Despite this knowledge, the Board made the business decision to roll out PSMSs sequentially at its subsidiaries. How to implement a PSMS was a legitimate business decision for the Board to make. Implementing a PSMS at an enterprise level was not legally required of NiSource before the Greater Lawrence Explosion. How to move forward with the PSMSs required an assessment of business risk. In hindsight, it is regrettable that the Board did not invest additional resources in a company-wide rollout

---

[163] 698 A.2d at 970.

[164] *See* Am. Compl. ¶ 38; *see also id.* ¶ 64 ("[W]hen NiSource was forced by state regulators to take actions to attempt to ensure Virginia Gas' and NIPSCO's compliance with federal and state pipeline safety laws prior to the Greater Lawrence Explosions, the 220 Documents confirm that *the Board knew exactly what actions to take*. In this regard, the Board authorized the implementation of a new PSMS as recommended by RP 1173 . . . but only after strongarming by those states' regulators.") (emphasis added).

earlier. But it is not possible to infer that the Board's decision to start a phased implementation voluntarily reflects the type of law-breaking business model at issue in *Massey*. Defendants do not face a substantial likelihood of liability under Plaintiff's *Massey* Theory.

### 2. The Red-Flags Theory

A plaintiff can plead a prong-two *Caremark* claim by alleging "particularized facts that the board knew of red flags but consciously disregarded them in bad faith."[165] The intuitive notion underlying the red-flags theory is that "sophisticated and well-advised individuals like corporate directors do not customarily concede violations of positive law," and so a plaintiff must plead facts and circumstances sufficient for a court to infer this conduct.[166] "[A] *Caremark* plaintiff can plead that 'the directors were conscious of the fact that they were not doing their jobs,' and that they ignored 'red flags' indicating misconduct in defiance of their duties."[167] In other words, a claim that a board "had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning."[168]

---

[165] *Chou*, 2020 WL 5028065, at *17.

[166] *South*, 62 A.3d at 14–15; *see also Gen. Motors*, 2015 WL 3958724, at *16 (observing that red flags "are a proxy for pleading knowledge").

[167] *Shaev*, 2006 WL 391931, at *5 (footnote omitted).

[168] *Id.*

For a red-flag theory to work, the red flag must be sufficiently connected to the corporate trauma at issue to elevate the board's inaction in the face of the red flag to the level of bad faith. To quote former Chancellor Chandler, the relationship between the red flag and the corporate trauma cannot be "too attenuated."[169] Vice Chancellor Glasscock has described the requirement as one of "proximate cause," stating that "the corporate trauma in question must be sufficiently similar to the misconduct implied by the red flags such that the board's bad faith, conscious inaction proximately caused that trauma."[170]

No *Caremark* case has yet gone to trial, or proceeded meaningfully past the pleading stage, so many open issues remain. Those issues include what form of causation must be shown to hold a fiduciary liable under *Caremark* for their bad faith inaction, or who would bear the burden of proof on that issue. Even the elements for establishing liability are unsettled. Does a *Caremark* claim resemble a common law tort case where a plaintiff must prove the existence of a duty, breach in the form of bad faith conduct, causation, and damages? Or does the fact that the underlying theory invokes fiduciary duties and is an equitable tort mean that the plaintiff makes a *prima facie* showing of breach, at which point the burden shifts to the fiduciary breacher to justify her actions?

Like other *Caremark* decisions that have come before it, this is a pleading-stage decision. The question for present purposes is therefore whether it is reasonably

---

[169] *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010).

[170] *Okla. Firefighters Pension & Ret. Sys. v. Corbat*, 2017 WL 6452240, at *15 (Del. Ch. Dec. 18, 2017) (internal quotation marks omitted) (citing *Jacobs*, 2016 WL 4076369, at *8).

47

conceivable that the identified red flag would have placed a reasonable observer on notice of the risk of the corporate trauma that ensued.

Plaintiff's argument in support of its Red-Flags Theory is that, before the Greater Lawrence Explosions, the Board knew generally about serious issues concerning compliance with recordkeeping requirements under Part 192.[171] In addition to this general knowledge, Plaintiff alleges that the Board had specific knowledge of violations of Part 192 recordkeeping requirements involving other NiSource subsidiaries. Plaintiff further contends that the Board was aware, or at least should have been aware, that violations of Part 192 recordkeeping requirements as they relate to control lines posed risks specific to CMA.

This analysis first evaluates the adequacy of Plaintiff's allegations concerning the Board's knowledge of the supposed red flags. This analysis then turns to examining whether any of the events about which the Board was aware constituted actual red flags

---

[171] Pl.'s Ans. Br. at 34. In the Amended Complaint, Plaintiff alleged that prior explosions at NiSource subsidiaries supplied red flags regardless of the cause of those explosions. *See, e.g.*, Am. Compl. ¶ 84 (describing an explosion from an improperly abandoned service line); *id.* ¶ 88 (describing explosions resulting from a punctured gas line and external corrosion). In their opening brief, Defendants laid out the problems with that theory, including that "[t]here is no meaningful similarit[ies]" in the various explosions, and they "could not have put a reasonable observer on notice of the issues that caused the September 2018 overpressurization event." Defs.' Opening Br. at 45, 47; *see also id.* at 41–47 (walking through the purported "red flags" by location). Tacitly conceding the strength of those arguments, Plaintiff dropped this aspect of their Red-Flags Theory in their answering brief. *See* Pl.'s Ans. Br. at 34–45 (omitting that specific argument in discussing various red flags).

that would have placed a reasonable observer on notice of the risk of the Greater Lawrence Explosions.

### a. Plaintiff Has Adequately Alleged That The Board Knew Of General Risks Associated With Recordkeeping Obligations.

Plaintiff has adequately alleged that the Board and ES&S Committee were repeatedly informed that poor recordkeeping practices generally posed a significant risk to the Company. It is reasonably conceivable that these warnings were tied to Part 192's requirements.

As discussed in the factual background, Part 192 imposes general recordkeeping obligations on a gas operator, including the obligation to prepare and follow an O&M Manual of procedures for each pipeline. To ensure safety during maintenance operations, the O&M Manual must provide procedures for starting up and shutting down any part of the pipeline. The O&M Manual must also provide procedures for making construction records, maps, and operating history available to appropriate operating personnel.

Plaintiff has done more than plead generally that the Board was provided with warnings about recordkeeping. Plaintiff has pled specific instances. For example, during a January 27, 2016 Board meeting, a management presentation on Strategic Risk Assessment identified "record improvement" as a possible action to decrease the risk of a significant gas related event.[172]

---

[172] Dkt. 30, Ex. 6 at NISOURCE000085.

Another example took place during a March 21, 2016 ES&S Committee meeting. A management presentation on "Public Safety," which contained an appendix of slides concerning each NiSource subsidiary and identified "poor record [sic]" as 18% of the root causes of CMA's damage rates.[173] It further outlined a "Damage Prevention and Response Strategy" that involved "improv[ing] map revision process," adding various damage prevention personnel, creating a training module to support damage prevention messaging, among other things.[174] A few pages earlier, the presentation lists "poor record[s]" as a cause of damages to NiSource gas infrastructure from 2012 through 2015,[175] and identifies "Gaps in System Documentation (Maps & Records)" under the heading "Know Our Risks."[176]

Likewise, during a May 10, 2016 ES&S Committee meeting, a management report stated that "[f]ederal integrity management programs significantly changed the importance and emphasis on proper work execution and documentation."[177] And during an August 8, 2016 ES&S Committee meeting, a management report again identified "Improve Documentation" under the heading "Prevent – Take Action to Decrease Risk."[178] Of the

---

[173] Dkt. 31, Ex. 8 at NISOURCE000179.

[174] *Id.*

[175] *Id.* at NISOURCE000163.

[176] *Id.* at NISOURCE000167.

[177] Dkt. 31, Ex. 9 at NISOURCE000241.

[178] Dkt. 31, Ex. 11 at NISOURCE000332.

seven bullet points under that heading, "Improve Documentation" was one of only two that appears in a highlighted color.[179]

These examples are sufficient to support an inference that the Board knew of general risks associated with CMA's recordkeeping obligations.

> **b.      Plaintiff Has Adequately Alleged That The Board Knew Of The Specific Risks Of Recordkeeping Violations At Other NiSource Subsidiaries.**

Plaintiff also has adequately alleged that the Board was made aware of serious issues concerning violations of specific recordkeeping requirements under Part 192 at NiSource subsidiaries other than CMA.  Plaintiff points to safety violations involving two other subsidiaries: NiSource's Ohio Gas subsidiary and NiSource's Indiana subsidiary.

> **i.      Ohio**

Plaintiff alleges that the Board was on notice that a March 2015 explosion involving NiSource's Ohio Gas subsidiary was caused by non-compliant recordkeeping and that the Board was aware of the explosion and its cause.

The March 2015 explosion erupted in Upper Arlington, Ohio, after an Ohio Gas service technician had arrived in the area to investigate a complaint about an odor of gas (the "Ohio Gas Explosion").  The gas-fed fire continued even after the technician disconnected the known service line.  When searching for other possible sources of the fire, the technician discovered an abandoned service line connected to a curb box mislabeled "water."  The discontinued line did not appear in the company's records.  The company

---

[179] *Id.*; *see also id.* at NISOURCE000335 (identifying "Improvement of facility records" under the heading "Prevent – Excavation Damage").

51

investigated the incident and came to the conclusion that it was possible that the leak from the abandoned service-line was caused by a third-party service provider, such as a water utility. The explosion and resulting fire caused $9 million in damages, but no fatalities or injuries. To settle litigation with the Ohio regulator concerning this incident, Ohio Gas paid a $200,000 fine and agreed to improve its recordkeeping procedures "by including GPS locations of curb boxes and other infrastructure."[180]

The Board was aware of the Ohio Gas Explosion, as both the ES&S Committee and the Board received reports from management regarding the incident.[181] The Board was informed of the details appearing in the above paragraph during a January 27, 2016 Board meeting. The Board was further informed, during that meeting, that "the discontinued and connected gas service line is an anomaly because all other gas main openings are accounted for in the Company's records."[182] It is reasonable to infer that the Board was informed of the resulting settlement, including the Ohio Gas subsidiary's agreement to improve its recordkeeping.

### ii. Indiana

Plaintiff alleges that the Board knew that NiSource's Indiana gas subsidiary, NIPSCO, had a long history of violating pipeline safety laws. The Amended Complaint details those violations.

---

[180] Am. Compl. ¶ 86.

[181] Dkt. 30, Ex. 6 at NISOURCE000005, -09, -95 (January 27, 2016 Board minutes and presentations); Dkt. 31, Ex. 8 at NISOURCE000165 (March 21, 2016 ES&S Committee minutes and presentations).

[182] Dkt. 30, Ex. 6 at NISOURCE000095.

In August 2017, the IURC filed a petition against NIPSCO seeking civil penalties for "at least 261 violations that occurred between January 1, 2015 and March 8, 2016."[183] The IURC ultimately found, and NIPSCO admitted to committing, 261 violations grouped into two categories: (1) failure to locate underground facilities within 48 hours of a request to do so to facilitate a third-party excavation and (2) NIPSCO's related failure to maintain accurate maps and record for those facilities.[184] As part of a settlement agreement with the IURC, NIPSCO agreed to implement a PSMS.[185] This settlement also required that NIPSCO report its safety violations. NIPSCO reported "another 617 statutory violations covering part of 2017 and the years 2018 and 2019, for which it was fined another $3.013 million" including 234 violations in 2019 alone.[186]

It is reasonable to infer that Board was aware of the NIPSCO violations, as both the ES&S Committee and the Board received reports from management regarding the discussions with the IURC that led to the consent orders.[187] For example, before the IURC filed its petition against NIPSCO on May 9, 2017, the Board received a report from NiSource's Chief Transformation Officer on "an initiative to improve the operating model of NIPSCO's gas operations."[188] She stated that NIPSCO had received the "notice of

---

[183] Am. Compl. ¶ 68 (emphasis omitted).

[184] *Id.* ¶ 70.

[185] *Id.* ¶ 73.

[186] *Id.* ¶¶ 75–76.

[187] Dkt. 32, Ex. 17 at NISOURCE000651 (March 8, 2017 ES&S Committee minutes), Ex. 18 at NISOURCE000698 (May 9, 2017 Board minutes).

[188] Dkt. 32, Ex. 18 at NISOURCE000698.

violation regarding line locates," and "summarized the results of an internal audit related to the pipeline safety management system."[189] The Board then "discussed NIPSCO's initiative to accelerate line locates and record keeping improvements," as well as "NIPSCO's efforts to improve its overall compliance process and operational excellence."[190] The ES&S Committee received updates on the NIPSCO's safety, leaks, and damage prevention at later meetings.[191]

### c. Plaintiff Has Not Adequately Alleged That The Board Knew Of The Specific Dangers Of Poor Recordkeeping Concerning Control Lines At CMA.

By contrast, Plaintiff has not adequately alleged that the Board was aware of specific dangers at CMA posed by recordkeeping concerning control lines. In support of such an inference, Plaintiff points to the September 2015 Operational Notice, which identified over-pressurization as a "known risk." Plaintiff also alleges that CMA had a history of over-pressurization events due in part to violations of Part 192's documentation requirements, which resulted in a February 2016 over-pressurization event in Taunton, Massachusetts (the "Taunton Event").[192] These allegations are not sufficient to support the inference of knowledge regarding CMA's operations that Plaintiff seeks.

---

[189] *Id.*

[190] *Id.*

[191] *See, e.g.*, Dkt. 31, Ex. 11 at NISOURCE000347, -348 (August 8, 2016 Committee materials); Dkt. 32, Ex. 19 at NISOURCE000836, -837 (August 7, 2017 Committee materials), Ex. 22 at NISOURCE001099, -1100 (January 25, 2018 Committee materials).

[192] Am. Compl. ¶ 78.

### i.    The Operational Notice

Plaintiff relies on the Operational Notice, but Plaintiff fails to allege facts that would support an inference that the Board knew of it.  The Operational Notice was issued by NiSource and CMA in response to a "near miss" event involving another NiSource subsidiary outside of Massachusetts where a construction crew came close to hitting a control line.[193]  The Operational Notice specifically warned that a broken or disrupted control line could lead to a catastrophic event:

> If a control line breaks, the regulator will sense a pressure loss, causing the valve to open further, resulting in an over pressurization of the downstream piping system, which may lead to a catastrophic event.  The same result occurs if the flow through the control line is otherwise disrupted (*e.g.*, control line valve shut off, control line isolated from the regulator it is controlling).[194]

The twofold objective of the Operational Notice was to: (1) "[b]ring awareness to Company and Contractor employees regarding the existence and importance of regulator control lines . . . that help to *provide critical sensing information for the accurate monitoring and control of outlet pressure into the Company's piping systems*" and (2) "[s]et forth required actions for future Company excavations."[195]

Despite identifying the need to provide critical sensing information, neither the Operational Notice, nor the Company generally, implemented procedures to ensure that control lines were accounted for or properly mapped.  Rather, after the near-miss event, the

---

[193] *Id.* ¶ 91.

[194] *Id.* ¶ 93.

[195] *Id.* ¶ 92 (emphasis added).

Company continued to rely on an "informal practice of encouraging verbal communications among members" of the various construction teams "when excavation took place within the footprint of a [Regulator] Station."[196]

Unlike with other events described in the complaint, Plaintiff does not allege that the near-miss event or the Operational Notice were discussed at the Board level or referenced or identified in any Board materials in advance of the Greater Lawrence Explosions. Plaintiff learned of the notice through the USAO filing setting out the formal charges against CMA in connection with the Greater Lawrence Explosions. In that filing, the USAO cited to the near-miss event and Operational Notice as evidence that CMA was on notice of the root causes that led to the Greater Lawrence Explosions as of September 2, 2015.[197] It is reasonable to infer that the Board learned of the Operational Notice from that filing as well. That filing was made on February 26, 2020. A red flag that directors learned of after the fact comes too late.

Just as the USAO inferred that CMA had knowledge of the Operational Notice before the Greater Lawrence Explosions, Plaintiff suggests that it is fair to infer that the Board had knowledge of the Operational Notice before the Greater Lawrence Explosions. But allegations concerning CMA's knowledge are not sufficient to support an inference that the Board was made aware of the near-miss event or the Operational Notice before the

---

[196] *Id.* ¶ 94.

[197] Dkt. 24, Ex. B

Greater Lawrence Explosions.[198]   Under Delaware law, Plaintiffs must allege particular facts to support an inference of Board knowledge of the near-miss event and Operational Notice.  Those facts are non-existent, and certainly not sufficiently particularized, to satisfy the Rule 23.1 standard.[199]

### ii.     The Taunton Event

Plaintiff also seeks to establish Board knowledge by alleging that CMA had a history of over-pressurization events, including the Taunton Event and four others from 2011 to 2016.[200]  Although Plaintiff alleges a "history" of such events and identifies five in total, the Amended Complaint identifies only one with specificity—the Taunton Event. This decision thus addresses the allegations as to that event only.

CMA self-reported the Taunton Event to the Massachusetts Department of Public Utilities ("DPU") in 2016.  The DPU determined that CMA violated the record-keeping provision of Part 192 and a issued Notice of Probable Violation on March 14, 2018. [201] CMA and DPU entered into a consent agreement on November 30, 2018, which required CMA to pay a $75,000 fine.[202]

---

[198] *See* Am. Compl. ¶ 219 (alleging that "the Board knew or should have known that on September 2, 2015, NiSource and CMA internally disseminated ON 15-05 due to a 'near miss' experience involving another NiSource company").

[199] *See, e.g., In re SAIC Inc. Deriv. Litig.*, 948 F. Supp. 2d 366, 384 (S.D.N.Y. 2013) (rejecting argument that knowledge of core operations can be imputed to the board for the purpose of a demand futility analysis).

[200] Am. Compl. ¶ 78.

[201] *Id.* ¶¶ 80–81.

[202] Dkt. 33, Ex. 50 (DPU Consent Order) at 1–2; (Notice of Probable Violation) at 2.

As with the Operational Notice, Plaintiff failed to plead that the Board was aware of the Taunton Event before the Greater Lawrence Explosions. The Amended Complaint alleges that "CMA was cited and fined by the DPU" and that "[t]he Taunton Event was widely publicized and well-known to the Board," but fails to allege with particularity facts supporting that inference.[203] Blanket statements that the Board "should have known" about a purported red flag are not sufficient under Rule 23.1.[204]

### d. Plaintiff Fails To Adequately Allege That The Board Faces A Substantial Likelihood Of Liability Under The Red-Flags Theory.

Summing up, Plaintiff has not adequately alleged that the Board had knowledge of the near-miss event, the Operational Notice, or the Taunton Event. Plaintiff has successfully alleged general knowledge of recordkeeping problems, as well as specific knowledge of recordkeeping problems at gas subsidiaries other than CMA. Plaintiff has not successfully alleged facts that would support an inference of knowledge regarding red flags associated with CMA. The final step is what would be required to support a *Caremark* claim under the facts of this case.

As discussed above, Plaintiff has adequately alleged that the Board was generally aware that Part 192 recordkeeping violations posed a significant risk to the Company. The Board was aware of specific problems resulting from non-compliance at other subsidiaries, such as the Ohio Gas Explosion and regulatory problems at NIPSCO.

---

[203] Am. Compl. ¶¶ 79, 83.

[204] *See In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *13 n.187 (Del. Ch. Aug. 17, 2020).

The question is whether it is reasonably conceivable the Board's knowledge of general recordkeeping deficiencies, the Ohio Gas Explosion, and the NIPSCO violations would have placed a reasonable observer on notice of the risk of the Greater Lawrence Explosions. That is not reasonably conceivable. General risks are not "red flags" of a specific corporate trauma.[205] To the contrary, such knowledge may be evidence that the reporting system in place is working as it should. By contrast, "red flags put the board on notice that the system is not working properly."[206]

It is also not reasonably conceivable that the Board's knowledge of the Ohio Gas Explosion was a red flag for the Greater Lawrence Explosions. Plaintiffs argue that the Ohio Gas Explosion was caused by a recordkeeping failure similar to that of the Greater Lawrence Explosion, and it is true that both Ohio Gas and CMA are subject to the recordkeeping regulations of Part 192. But Part 192 covers a broad array of recordkeeping requirements, and it is not reasonable that a generalized failure to comply with an expansive regulation at one NiSource subsidiary could have alerted the Board to the specific risk at

---

[205] *See, e.g.*, *South*, 62 A.3d at 18 ("[T]hree mining incidents in a year does not support a reasonable inference of board involvement, much less bad faith, conscious wrongdoing, or knowing indifference on the part of a board of directors, particularly where the incidents appear unrelated. In a large corporation engaged in a dangerous business, three incidents could readily happen in a single year because of decisions made and actions taken sufficiently deep in the organization for the board not to have been involved."); *Jacobs*, 2016 WL 4076369, at *8 ("The subsequent complained-of 'corporate trauma,' . . . must be sufficiently similar to the misconduct implied by the 'red flags' such that the board's bad faith, 'conscious inaction' proximately caused that trauma."); *Reiter*, 2016 WL 6081823, at *13 (describing the company's "escalating . . . compliance risk" and "heightened regulatory scrutiny" as "yellow flags of caution").

[206] *Horman*, 2017 WL 242571, at *11.

another NiSource subsidiary. More granularly, it is not reasonably conceivable that a report concerning an abandoned service line, hooked to a mislabeled curb box, which might have been opened by a third-party service reporter, and which was anomalously not recorded in the Ohio Gas subsidiary's records, would have placed a reasonable observer on notice of the risk involving the location of control lines or the development of engineering plans that caused the Greater Lawrence Explosions. This court has rejected the idea that "alleged prior, *unrelated* wrongdoing would make directors sensitive to similar circumstances."[207]

The NIPSCO violations present a closer call. Plaintiff says that the NIPSCO violations presented "the exact same issues that . . . caused the Greater Lawrence Explosions," and that is not too much of an exaggeration.[208] NIPSCO struggled to respond accurately and timely to requests to locate underground facilities in part due to the inaccuracy and inaccessibility of NIPSCO's maps and records. The fact that those requests

---

[207] *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 129 (Del. Ch. 2009) (rejecting plaintiff's attempt to invoke *McCall v. Scott*, 239 F.3d 808 (6th Cir. 2001) as supportive of that notion); *see also MetLife*, 2020 WL 4746635, at *15 (holding that failure to incorporate improved processes from government investigations and a regulatory settlement agreement admitting fault across even "'analogous' lines of business" did not permit an inference of bad faith on the part of the directors); *Fisher*, 2021 WL 1197577, at *16 (holding that four presentations regarding "trends in customer complaint volume" were not red flags for purposes of the corporate trauma of "violat[ing] consumer protection laws"); *In re GoPro, Inc.*, 2020 WL 2036602, at *14 n.171 (Del. Ch. Apr. 28, 2020) ("Plaintiffs argue 'prior inventory issues' GoPro had with the HERO4 line of cameras in 2015 were 'red flags' that the Board ignored in regards to the Company's Karma inventory. Plaintiffs offer no reason why overproduction of an unrelated product would or should have led the Board to question the Karma Production Forecast.").

[208] Am. Compl. ¶ 65.

were made for purposes of third-party excavation, as opposed for purposes of designing construction plans, seems a distinction without consequence. It is no "epistemological leap"[209] to conclude that the inability to locate underground facilities in the former scenario might lead to an inability to locate underground facilities, such as control lines, in all scenarios.

Yet the NIPSCO violations had to do with a failure to *follow* internal documentation, not *maintain* proper documentation. And, as Defendants point out, many of the NIPSCO violations and fines occurred after the Greater Lawrence Explosions.[210]

The real question is whether knowledge of the NIPSCO violations constituted a red flag for the risk of an over-pressurization incident caused by control line issues at a different subsidiary in a different state. That inference is not reasonably conceivable. The NIPSCO violations would not place a reasonable person on notice of the risk of the Greater Lawrence Explosions, even when evaluated against the Board's general knowledge of recordkeeping issues.

*In re Dow Chemical Co. Derivative Litigation* is instructive.[211] In *Dow*, a joint venture called "K-Dow" between Dow and a Kuwaiti company fell apart due to alleged "bribery, misrepresentations, insider trading, and wasteful and excessive compensation."[212] After the K-Dow deal disintegrated, Dow refused to close on a merger transaction with

---

[209] *MetLife*, 2020 WL 4746635, at *15.

[210] Defs.' Reply Br. at 19 (citing Am. Compl. ¶¶ 75–76).

[211] 2010 WL 66769 (Del. Ch. Jan. 11, 2010).

[212] *Id.* at *5.

61

Rohm & Haas Company. The plaintiffs asserted *Caremark* claims alleging, in part, that the Dow directors breached their fiduciary duties by failing to detect and prevent the alleged wrongs plaguing K-Dow. As a red flag supporting their *Caremark* claim, the plaintiffs pointed to a prior time when Dow paid a fine to the SEC due to bribery issues.

Chancellor Chandler granted the motion to dismiss. He rejected the argument that the prior fine for bribery constituted a red flag specific enough to give the Dow board cause for suspicion regarding K-Dow. He reasoned that the plaintiffs' chain of logic—in which, "because bribery may have occurred in the past, by different members of management, in a different country, and for a different reason, the board should have suspected similar conduct . . . in an unrelated transaction"—was "simply too attenuated to support a *Caremark* claim."[213]

Just as in *Dow*, the connection Plaintiff urges here is too attenuated. It is not reasonably conceivable that incidents concerning different employees, in a different state, in unrelated projects or events would have placed a reasonable person on notice of the recordkeeping and weak engineering that led to the Greater Lawrence Explosions, even when viewed against the Board's general knowledge of recordkeeping issues that Plaintiff alleged.

Defendants do not face a substantial likelihood of liability under Plaintiff's Red-Flags Theory.

---

[213] *Id.*

## III. CONCLUSION

Plaintiff has failed to allege that at least half of the Board faces a substantial likelihood of liability under either prong of the *Caremark* doctrine. Plaintiff thus has failed to establish that a demand on the Board is futile under Court of Chancery Rule 23.1. Defendants' motion to dismiss is GRANTED.